IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| EDITH A. SIPES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:16CV1071 |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Edith Sipes ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on August 15, 2012, alleging a disability onset date of July 27, 2012. (Tr. at 22, 133-34.)[2] Her claim was denied initially (Tr. at 67-80, 97-101), and that determination was upheld on reconsideration (Tr. at 81-96, 107-

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Record [Doc. #8].

14). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 115-16.) Plaintiff attended the subsequent hearing on December 4, 2014, along with her attorney and an impartial vocational expert. (Tr. at 22.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 31), and, on August 28, 2016, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

3

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since July 27, 2012, her alleged onset date. Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> obesity, hypertension, diabetes mellitus, degenerative disc disease, fibromyalgia (alternatively referred to as polyarthralgia), obstructive sleep apnea, borderline personality disorder, and depression.

(Tr. at 24.) The ALJ found at step three that none of these impairments, either individually or in combination, met or equaled a disability listing. (Tr. at 26.) Therefore, the ALJ assessed

---

determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

Plaintiff's RFC and determined that she could perform light work with myriad postural limitations. Additionally, he found Plaintiff "limited to simple, routine, repetitive tasks and unskilled work with occasional public contact." (Tr. at 28.) Based on this determination, the ALJ determined at step four of the analysis that Plaintiff could not perform her past relevant work. (Tr. at 30.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in the national economy. (Tr. at 30-31.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 31.)

Plaintiff now challenges the ALJ's mental RFC assessment in two respects. First, she contends that the RFC failed to comply with both Social Security Ruling 96-8p and the Fourth Circuit's decision in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). Second, she argues that the ALJ failed to properly consider the opinions of Plaintiff's treating psychiatrist, Dr. Rajeshree Dimkpa. After a thorough review of the record, the Court agrees that Plaintiff's second contention merits remand.

The Fourth Circuit has held that for claims, like Plaintiff's, filed before March 24, 2017, ALJs must evaluate medical opinion evidence in accordance with 20 C.F.R. § 404.1527(c) and the "treating physician rule" embodied within the regulations. Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). Under these regulations, "medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)). While the regulations mandate that the ALJ evaluate each medical

opinion presented to him, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)). The ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling 96-2p, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *5 (July 2, 1996) ("SSR"); 20 C.F.R. § 404.1527(c)(2); see also Brown, 873 F.3d at 255; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[5] Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether

---

[5] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

the source is a specialist, and (7) any other factors that may support or contradict the opinion. Moreover, even if an opinion by a treating physician is given controlling weight with respect to the nature and severity of a claimant's impairments, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted).

In this case, on October 21, 2014, Dr. Dimkpa completed a six-page Mental Impairment Questionnaire stating that she had treated Plaintiff monthly since July 2011, spending 25 to 40 minutes with her at each appointment. (Tr. at 864-69.) Dr. Dimkpa noted Plaintiff's diagnoses of Depressive Disorder with psychotic features and Borderline Personality Disorder, with a GAF score of 40. She further indicated that Plaintiff suffered from severe depression, exacerbated by psychosis, with "ongoing episodes of relapse," including periodic suicidal thoughts and behavior. (Tr. at 864.) She further posited that Plaintiff's mental health impairment precluded her ability to function in several areas required to perform even unskilled work, namely (1) her ability to perform at a consistent pace without an unreasonable number and length of rest periods, (2) her ability to accept instructions and respond appropriately to criticism from supervisors, and (3) her ability to deal with normal

work stress. Additionally, Dr. Dimkpa found Plaintiff seriously limited or unable to meet competitive standards in numerous other functional areas. (Tr. at 866.) She explained that Plaintiff's recurring episodes of acute mental illness, exacerbated by the chronic pain from Plaintiff's physical issues, caused these limitations and rendered her unable to maintain a job. (Tr. at 867.) The ALJ assigned Dr. Dimkpa's opinion little weight, noting as follows:

> Dr. Dimkpa submitted a medical source statement dated October 2014 on which she opined that [Plaintiff's] mental health conditions prevented her from performing substantial gainful activity. However, Dr. Dimkpa's opinion is not fully supported by the objective medical evidence of record for the reasons more fully discussed above. More importantly, the ultimate issue of disability is reserved for the Commissioner.

(Tr. at 30.)

As an initial matter, the Court notes that the ALJ's analysis only addresses Dr. Dimkpa's conclusion regarding Plaintiff's ability to work, without considering any of the underlying functional limitations described in her opinion or any of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including Dr. Dimkpa's status as a mental health care specialist who treated Plaintiff monthly over the course of several years. Dr. Dimkpa provided the kind of "detailed, longitudinal picture of [Plaintiff's] medical impairment(s)" contemplated by the treating physician rule, but the ALJ did not address the relevant factors as required.

In addition, the ALJ simply asserts that "Dr. Dimkpa's opinion is not fully supported by the objective medical evidence of record for the reasons more fully discussed above," but the ALJ does not cite to any "objective medical evidence" that is inconsistent Dr. Dimkpa's opinion, or otherwise explain his reasoning. In reviewing the evidence generally, the ALJ included the following paragraph regarding Plaintiff's mental health impairments:

9

> As for [Plaintiff's] mental health conditions, her treatment notes suggest that her symptoms tend to wax and wane with her life stressors (i.e. concern for daughter, family deaths, financial difficulties). [Tr. at 507, 509, 706.] Also of note, her treatment notes from Daymark Recovery indicate that she had multiple cancellations and "no shows" to her scheduled appointments. Nevertheless as of October 2013, [Plaintiff] reported that she felt better and that her mood was better overall. [Tr. at 531.] As of her July 2014 follow-up visit at Piedmont Interventional Pain Care, [Plaintiff's] depression was described as "asymptomatic" and [Plaintiff] was noted as tolerating her depression medications as well. [Tr. at 804.] Likewise, when she followed up at Rowan Psychiatric in August 2014, her mood was still described as "stable." At that time, she reported that she was sleeping well and that her appetite was "good."

(Tr. at 29.) However, even if the Court assumes that this discussion is the basis for the ALJ's assertion that Dr. Dimkpa's opinion is not supported by the objective medical evidence, the evidence cited by the ALJ does not support that conclusion.

For example, the ALJ specifically relied on the fact that "as of October 2013, [Plaintiff] reported that she felt better and that her mood was better overall." (Tr. at 29.) However, the ALJ failed to also note that this "improved" mood was recorded at Plaintiff's discharge following a week-long psychiatric hospitalization for attempted suicide. The remainder of those records reflect that Plaintiff was brought to the hospital on October 15, 2013, reporting that the devil told her to tattoo a cross on her wrist so she could go to heaven. (Tr. at 51, 529-31, 565, 617, 637.) Her self-inflicted injury required 5 staples, and during her initial interview, Plaintiff was described as "labile[,] going from laughing to crying." (Tr. at 617.) At the time of her hospitalization, Plaintiff also reported having hallucinations about the devil "about twice a month." (Tr. at 529.) At the time of her discharge, her GAF score was 45, and she was diagnosed with major depressive disorder with serious psychotic features and posttraumatic stress disorder. (Tr. at 529.) Thus, the fact that Plaintiff had "improved" to this point after a

week-long hospitalization does not provide substantial evidence for discounting Dr. Dimkpa's opinion.

The ALJ briefly mentioned Plaintiff's psychiatric hospitalization when identifying her "history of borderline personality disorder and depression" as severe impairments at step two, noting that Plaintiff's "reported symptoms include irritability, mood swings, and suicidal ideation for which [Plaintiff] was hospitalized in October 2013." (Tr. at 25.) He then recounted Plaintiff's testimony that she had been hospitalized for suicidal ideation three times, twice in early 2011 in addition to her stay in 2013. (Tr. at 28, 49-52, 73, 93, 499-500, 239-40, 529-30.)[6] However, the ALJ never addressed the length and severity of Plaintiff's October 2013 decompensation or the potential impact of such episodes on Plaintiff's ability to perform and maintain a job. The ALJ's reliance on the opinions of the State agency psychologists does nothing to remedy this issue, as those assessments were rendered in February and April of 2013, prior to Plaintiff's hospitalization. (Tr. at 77, 93.) In addition, because the State agency assessments addressed Plaintiff's functioning solely from July 27, 2012, forward to February and April 2013, they only cover a seven to nine month period of relative mental stability between Plaintiff's hospitalizations. No provider, other than Dr. Dimkpa, gave an opinion regarding the state of Plaintiff's mental health after April 2013.

---

[6] The treatment records reflect that Plaintiff's overnight admission on April 10, 2011 stemmed from a severe panic attack (Tr. at 499-500), and that her four-night hospitalization beginning on June 17, 2011 resulted from an argument with her husband regarding money (Tr. at 239). During the argument, Plaintiff threatened her husband with a knife and "made 10-12 superficial cuts on her left arm" which did not require repair. (Tr. at 184, 239.) Her six-night hospitalization in October 2013 involved more serious self-injury, hallucinations, and increased depression secondary to her pain and decreased physical abilities. (Tr. at 529.)

In addition, as set out above, the ALJ also noted that at an appointment at Rowan Psychiatric in August 2014, Plaintiff's mood was "stable" and her appetite was "good." (Tr. at 29, 700.) However, the Rowan Psychiatric treatment notes also reflect that for the two months prior, in June and July 2014, Plaintiff was experiencing olfactory hallucinations that she perceived as efforts by her deceased father and brother to send her a message. (Tr. at 702, 704-05, 710.) Her mood was depressed and her affect was sad. (Tr. at 703, 705). In that context, the fact that her mood was stable on one visit a month later is not inconsistent with Dr. Dimkpa's opinions. See also Testamark v. Berryhill, No. 17-2413, __ F. App'x __ (4th Cir. August 30, 2018) (finding that "the record provides reason to question the ALJ's basis" for discounting opinion evidence, where "the ALJ relied heavily on observations picked from check-the-box forms in Testamark's treatment notes . . . [but] [t]he ALJ did not explain the significance of these observations or why they were inconsistent with the functional limitations assessed by Testamark's treating sources," and further noting that "[b]ecause symptoms of mental illness may wax and wane over the course of treatment, the fact that Testamark exhibited fair judgment or appeared cooperative on certain specific occasions is not inconsistent with the conclusion that she is unable to work."). No other mental health records are addressed,[7] nor is there any explanation or analysis of how Dr. Dimkpa's opinions are not

---

[7] The ALJ noted that at a July 2014 follow-up visit at Piedmont Interventional Pain Care, Plaintiff's depression was described as "asymptomatic" and she was noted as tolerating her depression medications well. (Tr. at 29.) However, this was a physical exam, and a referral was made to follow up with psychiatry for her mental health issues. (Tr. at 803-04.) Those mental health issues are reflected in the records from June and July 2014 discussed above. With respect to the ALJ's notation that Plaintiff missed several appointments (Tr. at 29), these were group therapy sessions in late 2011 and early 2012, prior to the alleged onset date. (Tr. at 341, 336, 323, 303, 298, 286-93.)

supported by the objective medical evidence.[8]  Accordingly, the ALJ's dismissal of Dr. Dimkpa's opinions on the vague grounds that they are "not fully supported by the objective medical evidence" is insufficient to allow for meaningful judicial review and appears unsupported by substantial evidence.

Finally, the Court notes that Defendant cites to other evidence as contradicting Dr. Dimkpa's opinion, but these contentions involve selectively highlighting records in which Plaintiff's depression symptoms were under control, while omitting evidence from periods when her symptoms became acute.  Moreover, Defendant may not provide analysis or *post hoc* rationalizations not relied upon by the ALJ.  See Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. March 25, 2014) ("Review of the ALJ's ruling is limited further by the so-called 'Chenery Doctrine,' which prohibits courts from considering post hoc rationalizations in defense of administrative agency decisions. . . . Under the doctrine, a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency. . . . If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.' " (quoting Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194 (1947)).  Because

---

[8] The records reflect that following the October 2013 hospitalization, in February 2014, Plaintiff was having olfactory hallucinations and had an anxious mood and anxious affect. (Tr. at 710-11.)  In April 2014, she had increased crying spells and mood swings, with a depressed and anxious mood and a sad affect, and her diagnosis was Major Depressive Disorder, recurrent, moderate with psychotic features. (Tr. at 708-09).  In May 2014, Plaintiff's baseline remained "anxious," her medications were adjusted, her mood was depressed, and her affect was sad. (Tr. at 706-07.)  In June and July, she continued to have olfactory hallucinations and a depressed mood and sad affect, as discussed above. (Tr. at 702-03, 704-05.)  She complained of increasing memory problems throughout and was referred for further study. (Tr. at 718, 716, 712, 710.)

13

substantial evidence fails to support the ALJ's treatment of Dr. Dimkpa's opinion, remand is required.

Because remand is necessary for the reasons set out above, the Court need not address the additional issues raised by Plaintiff. [9]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #10] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 5th day of September, 2018.

                                          /s/ Joi Elizabeth Peake
                                          United States Magistrate Judge

---

[9] The Court does note that at the hearing, the ALJ offered to approve Plaintiff's claim as of August 2013. (Tr. at 52-53.) Plaintiff elected to continue with the hearing, presumably so as not to give up her alleged onset date of July 27, 2012. (Tr. at 54.) Plaintiff then attempted to call an additional witness regarding her emotional and mental impairments, but the ALJ stated, "I believe her. I believe her already. . . [H]e's not going to add anything. I'm inclined to pay the claim, as I said." Plaintiff's representative indicated that he would not call the additional witness if the ALJ had found Plaintiff to be credible, and the ALJ said, "I find her credible, eminently so." (Tr. at 62.) Notably, the Vocational Expert testified that if Plaintiff's testimony was taken as true, no jobs would be available, in light of Plaintiff's physical impairments and her mental state, which would put her off task. (Tr. at 65.) It is unclear why the ALJ changed his view of Plaintiff's credibility between the time of the hearing and the time of the decision. Moreover, if there was a basis to approve the claim as of August 2013, it is not clear why the ALJ denied the claim in its entirety. These issues can be considered further by the ALJ in light of the remand noted above.